IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JOSEPH BONG,

                 Petitioner,

    v.

MICHAEL THURMER, Warden,
Waupun Correctional Institution,

                 Respondent.

REPORT AND
RECOMMENDATION

08-cv-731-bbc

---

REPORT

Petitioner Joseph Bong is serving a 40 year prison sentence at Waupun Correctional Institution following his 2004 conviction in Dane County Circuit Court of sexual assault, armed robbery and related charges. Bong has filed a petition for habeas corpus pursuant to 28 U.S.C. § 2254 in which he contends that his trial attorney was ineffective and the court's evidentiary rulings undermined his right to present a defense. For the reasons stated below, I am recommending that the court deny Bong's petition and dismiss this case.

On September 4, 1997, a 38-year old, sight-impaired woman named Patricia was raped at knifepoint in her Madison home while her teenaged, pregnant daughter slept in a room across the hall. After the intruder left, Patricia called 911 and reported the crime, which spurred a police investigation. About a month later, Patricia recanted her statement after the investigating officers accused her of lying. Soon after, however, Patricia declared publicly that she had recanted only because she had been coerced into doing so by the investigating officers who refused to believe that she had been raped and threatened.[1]

---

[1] Patricia's case garnered significant local attention and was extensively chronicled in the *Isthmus*. *See* http://www.cryrapebook.com/Articles.html.

State investigators took over the case in 1998 but developed no leads until 2001, when a new DNA indexing database matched semen stains found on Patricia's sheets to petitioner Joseph Bong, a convicted felon and a cousin of someone Patricia's daughter had dated.  Bong was charged and found guilty at trial of five felony counts in connection with Patricia's rape.  The Wisconsin Court of Appeals upheld the conviction on appeal.

Having exhausted his state court remedies, Bong now seeks federal relief.  In his § 2254 petition, Bong contends that his right to present a defense was undermined when the trial court excluded a statement by Patricia's daughter admitting sexual contact with Bong prior to her mother's  rape. Bong also contends that he was deprived of his Sixth Amendment right to the effective assistance of counsel at trial because his attorney did not adequately explain the ramifications of Bong's decision not to testify.  Having considered Bong's arguments in light of the record, the state appellate court's analysis and the controlling Supreme Court precedent, I conclude that Bong has not met his  burden of showing that the state appellate court made any objectively unreasonable determinations when it rejected his constitutional claims and affirmed his conviction.  Accordingly, Bong is not entitled to federal habeas relief.

FACTS

The state court of appeals set out the operative facts in its decision denying Bong's direct appeal.  Bong has not presented any clear and convincing evidence to refute these facts, *see* 28 U.S.C. § 2254(e)(1), so I adopt them and recite them here for the reader's convenience::

> The charges arose out of allegations that an intruder entered the
> bedroom of Patricia M., a visually impaired person, while she was
> sleeping on September 4, 1997, and sexually assaulted her at knife
> point in several ways. Patricia testified that she retreated into a

2

closet after the assaults. She testified that the intruder removed the bottom fitted sheet from her bed, disabled the bedroom phone, and stole money from her backpack. Patricia said the intruder indicated during the assault that he already knew Patricia was visually impaired, asked about her teenaged daughter, and appeared to have known the door would be unlocked, which led Patricia to believe that her assailant knew either her or her daughter.

Patricia called 911. The police took the remaining top bed sheet and other items, and transported Patricia to a hospital to have a sexual assault examination and get stitches for a knife cut on her hand. The nurse observed two cuts on Patricia's face, one on her neck, one on her hand, and a red bruise on her inner thigh close to the vagina, and noted that Patricia was "controlled, cooperative, quiet, trembling, and tearful." There was also a one-centimeter abrasion on the outer edge of her anus, but no discernible trauma to Patricia's vaginal tissue and no seminal fluid. The police did not recover any fingerprints from any of the items Patricia said the intruder had touched. The bed sheet taken from Patricia's house was not tested for DNA until June of the following year.

About a month after the reported assault, the investigating detective informed Patricia that he believed she made up the entire story. According to Patricia, during a two-hour interview, the detective repeatedly asked Patricia why she made up the story and told her she would be detained on suicide watch unless she admitted making up the story. Patricia testified that she finally agreed that she made it all up. She testified that she did not think the police would let her leave until she did. Over time, Patricia became increasingly certain that her assailant was a person named Dominic Pena, her daughter's boyfriend at the time and the former boyfriend of her sister.

Over three and a half years after the reported assault, the police discovered a "match" to Bong from the biological samples on Patricia's bed sheet. Patricia's daughter Misty recognized Bong as someone she had known since high school. Misty had dated Bong's cousin Lonnie Elvord at one time and was also a friend of another

3

one of Bong's cousins, John Quamme. Elvord testified he was aware that Patricia collected money from vending machines and kept it in a vinyl bag. He also said he had either brought Bong along with him or picked him up from Misty's house once or twice while Bong was living with him. Misty told investigators that Quamme had mentioned to her that Bong was someone she should consider a suspect, although Quamme denied making any such comment.

The defense theory at trial was that either Pena committed the assault or Patricia fabricated the incident to gain attention or sympathy and blamed Pena to try to undermine his relationship with her daughter. FN1. A critical element of the defense strategy was to show that Bong's DNA got onto Patricia's bed sheet as the result of an alleged sexual encounter he had with Misty in her mother's bedroom. Bong did not testify, however, and Misty denied that she had ever been in her mother's bedroom with Bong. In fact, Misty said that she had only met Bong twice and, to her knowledge, he was never at her house.

FN1. Initially, Patricia told police she suspected Pena.

Bong countered Misty's testimony with the testimony of Ben Donahue, who had been a good friend of Bong for fourteen years. Donahue said that sometime toward the end of summer in 1997, he saw Misty performing fellatio on Bong in a "back room" at Misty's house, apparently in exchange for marijuana. Donahue did not further describe the room where this alleged incident occurred.

Bong unsuccessfully sought to introduce a prior statement Misty made to one of the investigating agents. Misty told Special Agent Elizabeth Feagles that she had intercourse with Bong on one occasion at the residence Bong shared with Quamme. Misty was still in high school and Bong was on "the bracelet" at the time. Thus, counsel explained, the sexual encounter between Bong and Misty at Quamme's house could have been as late as three and a half months before Patricia's assault.

*State v. Bong*, 2007 WI App 216, ¶¶2-8, 305 Wis. 2d 654, 739 N.W. 2d 490 (unpublished opinion).

4

Karen Doerfer Daily, a forensic scientist at the Wisconsin Crime Laboratory, testified that she analyzed Patty's top bed sheet in June 1998.  Daily was able to see two small stains consistent in appearance with semen stains.  The stains were located toward the top of the sheet, where the band of stitching is located.  From the stains, Daily was able to isolate sperm cells from which she extracted DNA and a non-sperm portion that contained both male and female DNA.  Trial Transcript, March 11, 2004, dkt. #10, exh. L.-2, at 74-76, 93-96.  Subsequent DNA testing of the extractions performed by another crime lab scientist, Curtis Knox, determined to a reasonable degree of scientific certainty that the DNA extracted from the sperm portion of the stains had come from Bong and that the non-sperm portion of the stains contained a mixture of DNA from two individuals:  Patricia and Bong.  *Id*. at 117.  Knox testified that only identical twins have the same DNA.  *Id*. at 107.

The jury convicted Bong on all counts.  After trial, Bong, now represented by a new lawyer, filed a motion for a new trial on the ground that the trial court had denied his right to present a defense by barring him from eliciting evidence that Misty had admitted to Agent Feagles that she had had sex with Bong on one occasion approximately three months before Patricia was sexually assaulted.  This evidence was crucial to his theory of defense, argued Bong, which was that he and Misty had a relatively ongoing intimate relationship, which explained how his semen got deposited on Patricia's bed sheets.  According to Bong, evidence of Misty's past sex with Bong would have undermined Misty's credibility by demonstrating that she had a stronger relationship with Bong than she had admitted.  Second, it would have bolstered Donahue's contention that Misty had had sex with Bong at her mother's home towards the end

5

of summer 1997, insofar as Misty's having had sex with Bong in the past supported an inference that she was more likely to have engaged in sex with him again three months later.

Bong also contended that his trial lawyer had been ineffective for failing to apprise him fully of the consequences of choosing not to testify.  Specifically, Bong argued that if he had taken the stand and testified that he had had an ongoing sexual relationship with Misty and that he had had a sexual encounter with Misty on Patricia's bed, then the court would have been required to admit Misty's prior statement that she and Bong had had sex on one occasion while she was in high school.

Because Bong's trial judge had retired, his motion was heard by a new judge.  At the evidentiary hearing, Bong's trial attorney, Mark Eisenberg, testified that Bong had decided not to testify after Eisenberg had advised him of the pros and cons of doing so.  Tr. of Post-Conviction Mot. Hrg., Apr. 19, 2006, dkt. 11, exh. 3, at 19.  Attorney Eisenberg explained that the "biggest negative" was the number of Bong's prior convictions, *id*. (Bong had 12 priors.  *Id*. at 31).  Attorney Eisenberg testified that Bong had never indicated that he wanted to testify, but rather was "pretty adamant" that he did not.  *Id*. at 23.

On June 1, 2006, the court issued its decision denying Bong's motions.  Dkt. 7, Exh. B, App. E.  The court agreed with Bong that it was unclear from the transcript why the trial court had excluded Misty's admission to Agent Feagles that she had had sex with Bong some time while she was in high school.  The court determined that the basis for the court's ruling was a "hybrid . . . incorporating both the concepts of relevance and prior acts."  *Id*. at 3.  In either case, the trial court properly excluded the evidence.  The court noted that even if the jury had completely discredited Misty's testimony and fully credited Donahue's, there was no evidence

that Bong ever had had sex with Misty in Patricia's bed.  The court noted that at the hearing and in his post-conviction affidavits, Bong never averred that he had sex with Misty in Patricia's bedroom or bed[2], and Donahue testified only that he saw Bong and Misty having sex in a "back room." *Id*. at 3-4.  In short, Misty's admission of having had sex with Bong approximately three months before the alleged crime was only marginally relevant, if at all, to establishing how Bong's semen could have ended up on Patricia's sheet.  *Id*. at 4.  Further, noted the court, any relevance that the evidence had was outweighed by its prejudicial impact.  *Id*.

The court also rejected Bong's allegation that Eisenberg had been ineffective for not advising Bong that he could testify regarding his prior sexual relationship with Misty and that, had he so testified, the trial court would have admitted Misty's testimony regarding that prior sexual relationship.  The court found that it was "by no means clear" that the trial court would have permitted Bong to testify about his prior sexual relationship with Misty absent evidence that any of the claimed sex between Misty and defendant occurred in Patricia's bedroom or bed. *Id*. at 6.   In short, evidence of Bong and Misty's alleged prior sexual relationship was inadmissible because it was not probative of any fact material to the case.  *Id.*

Reviewing Bong's arguments on appeal, the court of appeals began by assuming that Misty's admission that she had sex with Bong at someone else's house while she was in high school had "at least some relevance under Wis. Stat. § 904.02, given Bong's obvious need to show that his semen could have been deposited on Patricia's bed sheets at some time other than

---

[2] Attorney Eisenberg testified that he remembered Bong reporting having sex with Misty on Patricia's bed.  The court declined to give this hearsay evidence much weight, noting that Bong had twice submitted sworn testimony that made no such claim. Dkt. 7, Exh.B, App. E at 3-4.

the alleged assault, such as during a sexual encounter with Misty." *State v. Bong*, 2007 WI App 216, ¶14, 305 Wis. 2d 654, 739 N.W. 2d 490 (unpublished opinion).   The court found, however, that the probative value of the excluded evidence was insufficient to survive a challenge under Wis. Stat. § 904.03:[3]

> As Judge Niess's postconviction decision points out, even if the jury had accepted all of Donahue's testimony and rejected all of Misty's testimony, that does not place Bong in Patricia's bedroom during the relevant time period. There was nothing in Donahue's description of the "back room" where he allegedly witnessed a sexual act between Bong and Misty that would identify the bedroom as Patricia's rather than Misty's.  For instance, Donahue did not describe the location of the room in relation to the other bedroom or mention anything about the color of the bedding or the fact that the bed consisted of a mattress on the floor with no box spring or bed frame.   Moreover, Patricia testified that she routinely kept her bedroom door locked when she was not in it because she sometimes kept money from her vending machine route in there.  Donahue did not describe seeing Misty unlock any door, or provide any possible explanation for why Misty would have taken Bong into her mother's bedroom rather than her own.

> In addition, Patricia testified that she last washed her sheets about two weeks before the assault, which occurred on September 4, 1997.   Therefore, in order to provide a plausible alternative explanation for his semen, Bong needed to show that any sexual contact he had with Misty occurred within a time frame roughly two weeks before the assault. Donahue's testimony that he saw a sexual act occur sometime "towards the end of the summer" in 1997 was too vague to say with any certainty what week he was talking about.

> Given the low probative value of Donahue's testimony, even if believed, additional evidence offered merely to bolster Donahue's credibility would have even lower probative value.

---

[3]  These state evidentiary rules mirror F.R.Ev. 402 & 403.

In sum, we cannot conclude that the trial court erroneously exercised its discretion in barring evidence concerning Misty's prior sexual conduct. It was reasonable for the court to conclude that the probative value of Misty's admission that she had sex with Bong at someone else's house while she was still in high school was substantially outweighed by the risk of confusing the central issue at trial-namely, how Bong's semen got onto Patricia's bed sheet since the last time she washed her sheets.

*Id*. at ¶¶ 15-18.[4]

The court also rejected Bong's claim that the evidentiary ruling deprived him of his

constitutional right to present a defense:

The exclusion of Misty's admission of a prior sexual encounter with Bong at a third party's house did not completely prohibit Bong from impeaching Misty, or deprive him of material evidence so favorable to his defense as to necessarily prevent him from having a fair trial. Bong was allowed to ask Misty whether she had sex with him in her mother's bedroom, and she denied it. Misty's excluded statement that she had sex with Bong once at another time and place was not inconsistent with her trial testimony, and therefore would have had no impeachment value. In contrast, Bong was allowed to present other evidence which more directly contradicted Misty's denial-namely, Donahue's testimony that he had seen Misty performing fellatio on Bong in a "back room" of the house. This allowed Bong to make the argument that there was an explanation for his semen on Patricia's bed sheet, other than him being Patricia's assailant. We have already explained why the excluded evidence would not have significantly altered the strength of Bong's case. We therefore find no due process violation.

*Id*. at ¶20 (internal citation omitted).

---

[4] Having determined that Misty's prior admission could be properly excluded under Rule 904.03, the court did not consider whether it could also be excluded under Wis. Stat. § 904.04(2)(a) as improper "other acts" evidenced or under some analogy to Wisconsin's Rape Shield Law.

Turning to Bong's claim that Eisenberg had been ineffective for failing to explain to Bong how his decision not to testify could affect the court's decision to exclude Misty's statement to Agent Feagles, the court identified the controlling legal standard as the two-part test outlined in *Strickland v. Washington*, 466 U.S. 668, 698 (1984). *Id*. at ¶27. As an initial matter, the court noted that it could reject the claim on the ground that Bong had failed in either his affidavit or testimony to provide specific dates for any alleged sexual encounters with Misty and did not even say that he and Misty had sex on Patricia's bed. *Id*. at n.3. Nonetheless, because Eisenberg testified at the *Machner* hearing that Bong had made that statement to him, the court assumed for the sake of argument that Bong would have so testified. *Id*. Even so, found the court, Bong's *Strickland* claim failed for the same reason as his claim that Misty's prior statement to Agent Feagles should have been admitted to bolster Donahue's testimony:

> That is, Misty's admission that she had a single sexual encounter with Bong at a third party's house sometime before the fall of 1996 (which she told Feagles was the last time she had seen Bong) had next to no probative value on the question whether she also had a sexual encounter with Bong in her mother's bed within the week or two before her mother was assaulted in September 1997. Moreover, since nothing in Misty's earlier statement to Feagles contradicted her testimony that she never had sex with Bong in her mother's bedroom, the prior statement had little if any impeachment value. Therefore, we disagree with Bong's premise that Misty's prior statement would have been admissible if only Bong himself had testified. Consequently, we conclude that counsel did not perform ineffectively by failing to advise Bong that Misty's prior statement would come in if Bong testified.

*Id*. at ¶ 28.

Finally, the court declined to exercise its discretionary reversal power, finding that the real controversy in the case had been fully tried and that no miscarriage of justice had occurred. *Id*.

10

at ¶30.  The court explained that the question for the jury was whether Bong had assaulted Patricia on the night of September 4, 1997, which required the jury to determine first, whether an assault had actually occurred, and if so, whether Bong was the perpetrator.  With respect to the threshold question, the court noted that whether an assault had occurred had been "vigorously debated" at trial, and the jury obviously had found that Patricia's initial report was true and her recantation was false.  *Id*.  Explaining why it was satisfied that no miscarriage of justice had occurred with respect to the question whether Bong had committed the assault, the court wrote:

> Because Patricia was visually impaired and could not identify her attacker, the critical evidence at trial was a stain found on one of Patricia's bed sheets. Testing revealed that the stain contained a mixture of Bong's semen with Patricia's DNA. Since there was never any suggestion that Bong and Patricia had even met, much less had a consensual sexual relationship, Bong sought to explain that his semen resulted from a sexual encounter he had with Patricia's daughter. To succeed, the jury had to not only reject Misty's outright denial of any sexual encounter with Bong in her mother's bedroom, but to then find that Bong's semen had *coincidentally* mixed with a bodily secretion from Patricia on the sheet without any DNA contribution from Misty. In light of this DNA evidence, we do not consider it substantially probable that there would have been any different result at trial even if Bong had directly testified that he had sex with Misty on the bed and Misty had testified that she had sex with Bong once while in high school and that Bong might have picked her up at her house when she was dating his cousin the year before the assault.

*Id*. at ¶31 (emphasis in original).

The Wisconsin Supreme Court denied Bong's petition for review.

11

ANALYSIS

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a petitioner is entitled to habeas relief only when the decision of the last state court to consider his case is either "contrary to" or "an unreasonable application of" clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1).  A decision is contrary to clearly established federal law if the state court applies a rule that conflicts with a rule identified by the Supreme Court, or if the state court reaches a different conclusion than the Supreme Court in a case with materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  A decision involves an unreasonable application of clearly established law if the state court "identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case."  *Id*. at 413.  Under both tests, mere error is not sufficient; a state court's decision must be "objectively unreasonable."  *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003).

I.  Exclusion of Misty's Prior Sexual Conduct with Bong

Under the Sixth and Fourteenth Amendments, a defendant has a constitutional right to present witnesses and his version of the facts in his own defense.  *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); *Taylor v. Illinois*, 484 U.S. 400, 408-09 (1988); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *Washington v. Texas*, 388 U.S. 14, 19 (1967).  Although the exclusion of evidence can violate a defendant's right to present a defense, this right is not absolute.  *Taylor*, 484 U.S. at 410-11; *Morgan v. Krenke*, 232 F.3d 562, 569 (7th Cir. 2000).  "[T]he exclusion of even relevant evidence does not

12

automatically create a due process violation," because "states retain the right, also not absolute, to establish procedures for running their criminal trials." *Morgan,* 232 F.3d at 569; *see also Holmes,* 547 U.S. at 324; *United States v. Scheffer,* 523 U.S. 303, 308 (1998).  Petitioner must comply with state procedural and evidentiary rules designed to assure both fairness and reliability. *Chambers,* 410 U.S. at 302.  Such rules do not violate an accused's right to present a defense unless they are "arbitrary or disproportionate to the purposes they are designed to serve." *Holmes,* 547 U.S. at 324-25; *Scheffer,* 523 U.S. at 308.  Thus, "[w]hile the Constitution prohibits the exclusion of defense evidence under rules that serve no legitimate purpose . . . , well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors, such as unfair prejudice, confusion of the issues, or the potential to mislead the jury." *Holmes,* 547 U.S. at 326-27.  A trial judge has "wide latitude" to apply these evidentiary rules before running afoul of the Constitution. *Crane v. Kentucky,* 476 U.S. 683, 689-690 (1986).

Bong makes no suggestion that the Wisconsin Court of Appeals relied on an erroneous legal standard in evaluating whether his right to present a defense was violated when the trial court refused to permit him to introduce Misty's prior statement to Agent Feagles about her past sexual contact with Bong.  Instead, he seeks to show that the state appellate court's application of *Chambers* and its progeny was unreasonable.  Given the "wide latitude" afforded to trial judges in making evidentiary rulings, compounded by the deference federal courts owe to defensible state court opinions, it would be extraordinarily difficult for Bong to make this showing.

Bong insists that the Wisconsin Court of Appeals did not "fully grasp" the probative value of Misty's admission of a previous sexual encounter with Bong.  To the contrary, it is Bong

who misunderstands the evidence's significance, or more accurately, its lack of significance.  The fact that Misty had sex with Bong once, somewhere else, months earlier, even when combined with Donahue's testimony that he saw Misty performing fellatio on Bong once at Misty's house in late summer 1997, does not supporting the inference urged now by Bong: that he and Misty had an "ongoing" sexual relationship that involved multiple sexual encounters at Patricia's home and in her bed.  To the contrary, this sparse evidence more logically implies the lack of an ongoing sexual relationship and does not support the inference that Bong and Misty ever used Patricia's bed for sex.  Bong's evidentiary premise is rife with factual, temporal and logical gaps that cannot be bootstrapped into admissible evidence merely by Bong wishing it to be so.  At most—and this is sheer speculation—admission of the excluded evidence might have led the jury to conclude that Misty's relationship with Bong was not quite as limited as Misty testified, and therefore that Donahue's testimony was more believable.  This would have done nothing to explain how Bong's DNA got on Patricia's sheets within two weeks of the assault on Patricia.

Therefore, the trial court's decision to exclude Misty's statement to Agent Feagles was neither arbitrary nor disproportionate to the countervailing evidentiary concerns embodied in Wis. Stat. § 904.03.  In fact, it was the most logical ruling to make: injecting evidence of a sexual encounter between the victim's daughter and the defendant somewhere else three months before the charged sexual assault presented a genuine risk of jury confusion and had the potential to create unfair prejudice if the jury's assessment of Patricia's credibility were influenced by its disapproval of Misty's sexual behavior.

Even so, as the state appellate court noted, the trial court still allowed Bong some evidentiary latitude in attempting to establish his allegations.  The court allowed Bong to ask

14

Misty if she ever had had sex with him in her mother's bedroom and when–not surprisingly– she said "no," the court allowed Bong to present Donahue's testimony as impeachment of Misty's denial and to lay the best available groundwork for Bong's explanation how his DNA might have gotten on Patricia's sheet.  In sum, the court of appeals' conclusion on this evidentiary issue was well within the bounds of reasonableness.

Approaching on a different tack, Bong argues that this court should be wary of affording too much deference to the state appellate court's adjudication of his right-to-present-a-defense claim because that assessment was tainted by the court's misunderstanding of the nature and significance of the DNA evidence.  Bong supports this argument by citing the court's analysis of Bong's state law discretionary reversal claim, wherein the court suggested that Bong's conviction was (in Bong's words) a "slam dunk" because of the DNA evidence.  In particular, Bong challenges the court's statement that Bong's defense depended upon him showing that his "semen had *coincidentally* mixed with a bodily secretion from Patricia on the sheet without any DNA contribution from Misty."  According to Bong, this finding overlooks two critical facts: (1) Patricia's DNA could have been left on her sheet at a completely different time than Bong's; and, (2) there was no evidence that DNA samples from the bed had been compared with Misty's DNA.

Bong's arguments are unpersuasive.  First, nothing in the court's analysis indicates that it had completely and absolutely ruled out the possibility that Patricia's DNA could have been left on the sheet at a different time than Bong's DNA.  That said, logic and common sense suggest that this possibility is in the hit-by-lightning category: it would have taken an against-all-odds coincidence for a very small amount of Bong's semen from a sexual encounter with Misty

to be deposited precisely on top of a bodily secretion left by Patricia near the top band of the top bed sheet in roughly the preceding two weeks.  As for Bong's second premise, although it is true that there was no evidence that the female DNA found in the semen stains ever were compared with Misty's DNA, there also was no evidence suggesting the existence of more than one potential donor of the female DNA.  To the contrary, Knox testified that the semen stains contained DNA from two people:  Patricia and Bong.  Unless Misty and Patricia were identical twins, Misty could not have been the source of the female DNA attributed to Patricia.  Again, although Bong's contentions do not violate the physical laws of nature, he cannot possibly meet his burden of persuasion under § 2254 by pointing to perceived interstitial gaps in the trial testimony as proof that the state courts didn't know what they were talking about.

In sum, I am satisfied that the state court of appeals reasonably applied clearly established Supreme Court law in determining that the exclusion of Misty's statement to Agent Feagles did not deprive Bong of his constitutional right to present a defense.

II.  Ineffective Assistance of Counsel

To establish ineffective assistance of counsel in a criminal case, a defendant must prove both that (1) his attorney's performance fell below an objective standard of reasonableness, and (2) the attorney's deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  The defendant "bears a heavy burden when seeking to establish an ineffective assistance of counsel claim." *Jones v. Page*, 76 F.3d 831, 840 (7th Cir. 1996) (quoting *Drake v. Clark*, 14 F.3d 351, 355 (7th Cir. 1994)).  To satisfy the performance prong of the *Strickland* test, the defendant must identify the acts or omissions of counsel that form the basis

16

of his claim of ineffective assistance. *Strickland*, 466 U.S. at 690; *United States v. Moya-Gomez*, 860 F.2d 706, 763-64 (7th Cir. 1988). A court's review of counsel's performance is highly deferential, presuming reasonable judgment and declining to second-guess strategic choices. *Strickland*, 466 U.S. at 689; *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); *United States v. Williams*, 106 F.3d 1362, 1367 (7th Cir. 1997). To satisfy the prejudice prong of the test, the defendant must establish a reasonable probability that the result of his trial would have been different but for counsel's unprofessional errors. *Strickland*, 466 U.S. at 694; *Moya-Gomez*, 860 F.2d at 764. A "reasonable probability" is a "better than negligible" chance. *Gross v. Knight*, 560 F.3d 668, 672 (7th Cir. 2009).

Bong concedes that he and Eisenberg discussed whether Bong would testify at trial. Nonetheless, he contends that Eisenberg was ineffective because this was not a "real" discussion. Specifically, Bong alleges that Eisenberg never discussed with Bong that if he testified, it "could affect the introduction of Misty M.'s admission to having sex with him."

As an initial matter, it is helpful to clarify what testimony Bong was prepared to offer. In his brief, Bong asserts that Eisenberg never discussed with Bong that Bong could "testify personally that he had had sex with Misty M. on [Patricia's] bed." Pet.'s Brief, dkt. 14 at 21. However, as the state courts pointed out, Bong has never sworn that he would have so testified: in his testimony and affidavit submitted in support of his post-conviction motion, Bong claimed to have had multiple sexual encounters with Misty, some of which occurred in the victim's residence, but did not give specific dates for the encounters and he did not say that the sex occurred in the victim's bedroom or bed. The only evidence supporting Bong's contention is Eisenberg's testimony that Bong had made that assertion to him, but as the trial court noted,

17

clients often tell their lawyers things "that wither in the face of the testimonial oath."  Order Denying Post-Conviction Relief at 4.

Absent a declaration from Bong that he would taken the stand and testified that he had sex with Misty on her mother's bed within two weeks of the assault, it is easier to understand why Bong focuses on the effect his testifying would have had on the admission of Misty's statement to Agent Feagles as opposed to focusing on his testimony *qua* testimony.[5]

But even if this court assumes, *arguendo*–as did the state court of appeals–that Bong would have testified that he had sex with Misty on Patricia's bed within a few weeks of the assault on Misty's mother, it was far from certain that this claim would have caused the trial court to admit Misty's statement to Agent Feagles.  As the court of appeals pointed out, Misty's prior statement had "next to no probative value" on the critical question whether she had had sex with Bong in Patricia's bed within the week or two before Patricia was assaulted, and it had little impeachment value because Misty's admission did not contradict her testimony that she had never had sex with Bong in her mother's bedroom or in her house.

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."

---

[5] To the extent that Bong is pursuing an independent claim of ineffective assistance of counsel based on Attorney Eisenberg's's alleged failure to tell Bong that he could testify that he had sex with Misty on Patricia's bed, he has waived or defaulted it.  In his brief, Bong fails to develop any argument on this point, focusing solely on the impact that his testimony would have had on the admission of Misty's statement to Agent Feagles.  Further, as noted above, Bong never averred that he had sex with Misty on Patricia's bed.  Finally, Bong did not fairly present this claim to the state appellate court.  *See* Br. and App. of Def.-App, dkt. 7, exh. 3, at 25-26 (focusing on Misty's admission).

*Strickland*, 466 U.S. at 689.  The trial court had rejected counsel's previous attempts to introduce Misty's statement, over counsel's vigorous objection.  Given the trial court's prior rulings, no reasonable lawyer would have predicted to Bong that the court would change its mind and admit Misty's prior statement if Bong testified.  Thus, it could not have been ineffective or prejudicial for Attorney Eisenberg not to predict an outcome that was highly unlikely to occur.

Bong has failed to show that the state court of appeals made any unreasonable determinations of fact or applied *Strickland* unreasonably when it concluded that his lawyer did not perform deficiently when he failed to advise Bong that Misty's prior statement would come in if Bong testified.

## RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that this court deny Joseph Bong's petition for a writ of habeas corpus and dismiss this case.

Entered this 2nd day of June, 2009.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

19

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

120 N. Henry Street, Rm. 540
Post Office Box 591
Madison, Wisconsin  53701

Chambers of
STEPHEN L. CROCKER
U.S. Magistrate Judge

Telephone
(608) 264-5153

June 2, 2009

Joseph L. Sommers
Attorney at Law
P.O. Box 244
Oregon, WI 53575-0244

Marguerite Moeller
Assistant Attorney General
P.O. Box 7857
Madison, WI 53707-7857

Re:___Bong v. Thurmer
Case No. 08-cv-731-bbc

Dear Counsel:

The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

In accordance with the provisions set forth in the memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before June 16, 2009, by filing a memorandum with the court with a copy to opposing counsel.

If no memorandum is received by June 16, 2009, the court will proceed to consider the magistrate judge's Report and Recommendation.

Sincerely,

/s/

Connie A. Korth
Secretary to Magistrate Judge Crocker

Enclosures
cc:   Honorable Barbara B. Crabb, District Judge

MEMORANDUM REGARDING REPORTS AND RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b), the district judges of this court have designated the full-time magistrate judge to submit to them proposed findings of fact and recommendations for disposition by the district judges of motions seeking:

(1) injunctive relief;

(2) judgment on the pleadings;

(3) summary judgment;

(4) to dismiss or quash an indictment or information;

(5) to suppress evidence in a criminal case;

(6) to dismiss or to permit maintenance of a class action;

(7) to dismiss for failure to state a claim upon which relief can be granted;

(8) to dismiss actions involuntarily; and

(9) applications for post-trial relief made by individuals convicted of criminal offenses.

Pursuant to § 636(b)(1)(B) and (C), the magistrate judge will conduct any necessary hearings and will file and serve a report and recommendation setting forth his proposed findings of fact and recommended disposition of each motion.

Any party may object to the magistrate judge's findings of fact and recommended disposition by filing and serving written objections not later than the date specified by the court in the report and recommendation. Any written objection must identify specifically all proposed findings of fact and all proposed conclusions of law to which the party objects and must set forth

with particularity the bases for these objections.  An objecting party shall serve and file a copy of the transcript of those portions of any evidentiary hearing relevant to the proposed findings or conclusions to which that party is objection.  Upon a party's showing of good cause, the district judge or magistrate judge may extend the deadline for filing and serving objections.

After the time to object has passed, the clerk of court shall transmit to the district judge the magistrate judge's report and recommendation along with any objections to it.

The district judge shall review de novo those portions the report and recommendation to which a party objects.  The district judge, in his or her discretion, may review portions of the report and recommendation to which there is no objection.  The district judge may accept, reject or modify, in whole or in part, the magistrate judge's proposed findings and conclusions.  The district judge, in his or her discretion, may conduct a hearing, receive additional evidence, recall witnesses, recommit the matter to the magistrate judge, or make a determination based on the record developed before the magistrate judge.

**NOTE WELL: A party's failure to file timely, specific objections to the magistrate's proposed findings of fact and conclusions of law constitutes waiver of that party's right to appeal to the United States Court of Appeals.  *See United States v. Hall,* 462 F.3d 684, 688 (7th Cir. 2006).**